**IN THE UNITED STATES DISTRICT COUR**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Michael Magnuson and Constance Magnuson, Linda Mack, Adrianne Shaw, Mike Flanigan, Janean Monroe, Michael Fredrick, John Rich, Byron Smith, Kristine Breuker, Thomas James, Paul Fazio, Pamela Fazio, Mike Freed and Jane Freed, | |
| Plaintiffs, | |
| v. | Case No. |
| Window Rock Residential Recovery Fund, L.P., Window Rock Capital Partner GP, LLC, Window Rock Manager, LLC, Patrick Cardon, Cordell Rogers, Integrity Bank & Trust, Integrity Wealth Management, and Eric Davis, | |
| Defendants. | |

## COMPLAINT

I.   **NATURE OF ACTION**

1.      This case is being brought for violation of the federal securities laws, common law fraud, negligent misrepresentation, breach of fiduciary duty, and for violation under the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), for investments in the Window Rock Residential Recovery Fund C ("Fund"), managed by Defendant Window Rock Manager, LLC, and promoted and sponsored by Defendants Window Rock Capital Partner GP, LLC, Integrity Bank and Trust Company, and Integrity Wealth Management. The Window Rock entities will hereinafter be referred to

collectively as "Window Rock" and the Integrity entities will be collectively referred to as "Integrity."

2.      Both Window Rock and Integrity marketed the Fund to Plaintiffs' Illinois financial advisor, Thomas Hines ("Hines"). Plaintiffs began investing in the Fund in 2014. From that date to the time the Fund closed on February 28, 2020, Plaintiffs were repeatedly told that the Fund was performing, and their assets were secure, both orally and in writing. Indeed, Plaintiffs were given Quarterly Updates as late as the third quarter of 2019 indicating that there was $7.3 million of fund assets under management and that there was a "margin of safety," which Window Rock defined as "the difference between the basis of the portfolio loans and the value of real estate collateral," of $4.8 million. Seven months later, in a conference call, Window Rock informed investors that all assets had been lost.

3.      In fact, an investigation has uncovered that materials Window Rock and Integrity used to promote the Fund, which Plaintiffs relied on in investing in the Fund, contained materially false and misleading statements. Moreover, the Quarterly Updates that Window Rock and Integrity distributed to Plaintiffs were also materially false and misleading.

4.      In a video conference on or about April 2, 2020, Patrick Cardon, the Managing Director of the Fund, disclosed, for the first time, that there were no further assets to distribute, the Fund was closed and the communications to investors over the years, including to Plaintiffs and their financial advisor, did not accurately communicate the actual state of the Fund.

2

5.     Plaintiffs have lost approximately $1.3 million collectively.

## II.    <u>JURISDICTION AND VENUE</u>

6.     This action arises in part under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

7.     This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and applicable principles of supplemental jurisdiction under 28 U.S.C. § 1367. The state law claims in this action are so related to the federal claim that they form a part of the same case or controversy.

8.     The Court has personal jurisdiction over Defendants because they were marketing securities throughout the United States, including Illinois.

9.     Venue is properly laid in this District pursuant to Section 27 of the Exchange Act 15 U.S.C. § 78aa and 28 U.S.C. § 1391 (b)(2) or (b)(3), in that a substantial part of the events or omissions complained of herein and giving rise to the claims occurred in this District.

10.     Plaintiffs Michael and Constance Magnuson, Linda Mack, Adrianne Shaw, Mike Flanagan, and Janean Monroe, all reside in the Northern District of Illinois. In addition, Plaintiffs' financial advisor, Hines, is located in Chicago, Illinois, and Integrity and Window Rock marketed the Fund to Hines and his clients in Chicago, Illinois, and communicated with him in Chicago, Illinois, both by private visits and through the mail and wires. Moreover, Jeff Pettiford, a former officer of one or more of the Window Rock

entities, at all relevant times resided in Chicago, Illinois, and met with Hines in Chicago to promote and report on the performance of the Fund. In addition, Integrity's Executive Officer, Eric Davis, promoted the Fund to Hines in Chicago, visited Chicago to report on the performance of the Fund, and regularly communicated with Hines in Chicago, Illinois regarding the Fund.

11.     In connection with the acts and conduct alleged in this Complaint, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, and telephone, and wire systems to communicate with Plaintiffs and their financial advisor in Chicago.

## III.   **THE PARTIES**

12.     Plaintiffs are persons who invested in the Fund through Integrity.

13.     Plaintiffs Michael and Constance Magnuson are citizens of the United States and residents of Chicago, Illinois and invested in the Fund.

14.     Plaintiff Linda Mack is a citizen of the United States and resident of Chicago, Illinois and invested in the Fund.

15.     Plaintiff Adrianne Shaw is a citizen of the United States and resident of Crystal Lake, Illinois and invested in the Fund.

16.     Plaintiff Mike Flanigan is a citizen of the United States and resident of Crystal Lake, Illinois and invested in the fund.

17.     Plaintiff Janean Monroe is a citizen of the United States and resident Western Springs, Illinois and invested in the Fund.

4

18.     Plaintiff Michael Fredrick is a citizen of the United States and resident of Cincinnati, Ohio and invested in the Fund.

19.     Plaintiff John Rich is a citizen of the United States and resident of Dayton, Ohio and invested in the Fund.

20.     Plaintiff Byron Smith is a citizen of the United States and resident of Grand Blanc, Michigan and invested in the Fund.

21.     Plaintiff Kristine Breuker is a citizen of the United States and resident of North Muskegon, Michigan and invested in the Fund.

22.     Plaintiff Thomas James is a citizen of the United States and resident of Novato, California and invested in the Fund.

23.     Plaintiffs Paul and Pamela Fazio are citizens of the United States and residents of Weston, Florida and invested in the Fund.

24.     Plaintiffs Mike and Jane Freed are citizens of the United States and residents of Wichita, Kansas and invested in the Fund.

25.     Defendant Window Rock Residential Recovery Fund, L.P., is a Delaware limited partnership.

26.     Defendant Window Rock Capital Partner GP, LLC, is a Delaware limited liability company and the General Partner sponsoring the Fund.

27.     Defendant Window Rock Manager, LLC is a Delaware limited liability company and Manager of the Fund.

28.     Defendant Patrick Cardon is a Managing Director of the Fund and an officer of one or more of the Window Rock entities. His responsibilities included

5

sourcing and qualifying investment opportunities as well as managing the due diligence, workout, and marketing of the Fund and properties. Mr. Cardon is a citizen of the United States and resident of Gilbert, Arizona. Cardon was also involved in marketing the Fund in Illinois.

29.     Cordell Rogers was the Chief Financial Officer for one or more of the Window Rock entities and was actively involved in investor relations. Mr. Rogers is a citizen of the United States and resident of Queen Creek, Arizona. Rogers was also involved in marketing the Fund in Illinois.

30.     Defendant Integrity Bank & Trust is a Colorado corporation located in Monument, Colorado.

31.     Defendant Integrity Wealth Management is a Colorado limited liability company located in Highlands Ranch, Colorado.

32.     Defendant Eric Davis is an Executive Officer of Integrity Bank and Trust and actively marketed the Fund to Plaintiffs and Hines in Illinois. Davis is a citizen of the United States and resides in Colorado Springs, Colorado.

## IV.     FACTS COMMON TO ALL COUNTS

### A.     The Window Rock Fund

33.     Window Rock explained the Fund's objective in the Private Placement Memorandum ("PPM"):

> The Fund's principal investment objective is to achieve attractive returns through opportunistic investments in distressed residential loans and properties. See "Investment Program." The Fund may purchase and hold investments directly, or indirectly via separate investment vehicles and/or other entities (such as special purpose vehicles), including investment vehicles and/or entities that are operated and/or advised by

6

Window Rock Manager, LLC (the "Manager" or "Window Rock"), the General Partner or an affiliate thereof (collectively, the "Vehicles").

34. The Window Rock Fund had eight asset pools. Invested assets in each pool were used to acquire distressed real estate assets. The Fund which Plaintiffs invested in was the eighth asset pool.

35. Window Rock represented to investors that it follows an "exhaustive due diligence process [which] allows Window Rock to determine precisely the value of every asset before purchasing it."

36. Window Rock explained its due diligence process in the PPM by stating:

An exhaustive due diligence process allows Window Rock to determine precisely the value of every asset before purchasing it. Window Rock analyzes the underlying collateral value of each loan as well as the loan's payment history and borrower credit score. To determine collateral value, Window Rock uses its proprietary automated valuation model ("AVM"), a unique form for Broker Price Opinions ("BPOs"), and detailed property inspections that allow a multitude of data points to be analyzed and weighted in various ways in order to settle on a final value. As part of its valuation, Window Rock performs asset-level valuation including liabilities such as second mortgages, delinquent property taxes, judgment liens, and code violations.

37. Window Rock also represented that it conducts a "detailed financial analysis on each loan, using predictive modeling to project cash flows and workout paths from acquisition through final liquidation."

38. Moreover, Window Rock asserted in the PPM that it

manages downside risk by ensuring that investment opportunities have a *substantial margin of safety*. By buying assets at prices below replacement value and current market value (often in the fifty percent (50%) of collateral value range), Window Rock is prepared for worst-case scenarios. Window Rock's opportunistic value investment approach

> ensures that collateral values would have to decrease by an additional
> twenty to forty percent (20%-40%) to erode investor capital.

(Emphasis added.)

39.     Window Rock also asserted in the PPM that it "actively observe[s] the performance of each loan and will monitor and manage loan servicing in real time."

40.     Window Rock promised in the PPM that the Fund "will furnish audited financial statements on an annual basis, to all Limited Partners and . . . will also provide unaudited Capital Account balance information as well as information about the Fund's business activities and financial status to each Limited Partner on a quarterly basis."

41.     The financial statements, including the unaudited Capital Account balances, and information about the Fund's business activities and financial status were provided to Integrity, and not to Plaintiffs or their financial advisor.  Integrity did not share the detailed financial information with Plaintiffs or their financial advisor. In fact, Window Rock and Integrity concealed the detailed financial information from Plaintiffs and their financial advisor.

   **B.     Integrity's Role in The Fund**

42.     Integrity has represented to the public since at least 2010 that it specializes in providing alternative investment platforms to registered investment advisors and banks. To induce clients to invest through Integrity, Integrity emphasizes that it has an experienced investment committee that reviews and chooses alternative investments after rigorous due diligence. Moreover, Integrity represents that it monitors those

8

investment vehicles and provides periodic reports to investors as to the performance and status of those alternative investment vehicles.

43. Integrity was both a subscriber to the Fund and a "Sponsor" of the Fund.

44. As both a Sponsor and subscriber, Integrity promoted the fund to financial advisors with whom it had relationships. The financial advisors would then have their clients, including Plaintiffs here, invest assets with Integrity. Integrity would then pool the assets and invest them in the Fund.

45. Because Integrity was the subscriber to the Fund, all financial reporting coming from Window Rock came through Integrity.

46. Integrity was not just a seller of the Fund, and custodian of the assets invested through it, but it was also a fiduciary to the investors in the Fund

47. Integrity was privy to critical financial information from Window Rock that was not made available to investors, including Plaintiffs. Moreover, Integrity and Eric Davis represented to Plaintiffs, through their financial advisor, on multiple occasions that Integrity was actively monitoring the performance of the Fund based on financial information provided to it (but not to investors) by Window Rock. Additionally, Integrity, through Eric Davis, represented to Hines that it conducted an annual "Risk Review" of the Fund based on the confidential information that Window Rock provided.

48. In the September 14, 2018 Risk Review, in response to the question "Has the asset [Fund] met expectations?" the Integrity Risk Review team answered "Yes."

49.    The "expectations" for the Fund, which were stated in their promotional materials and in their Quarterly Update for the third-quarter 2018 was a "preferred return of 11.5% per year." At no time did the Fund provide a return of 11.5%. Indeed, the Fund provided a negative return in that roughly 66% of invested assets were lost.

**C.    Promotion of the Fund to Investors**

50.    Prior to investing in the Fund, Integrity and Window Rock prepared a Power Point presentation ("Presentation"), which they distributed to interested investors including to Plaintiffs. Figure 1, below is the cover page of that Presentation, which clearly identifies Integrity as a "Sponsor":

*Figure 1:Cover Page of Promotional Materials*



51.    To induce investors to invest in the new asset pool in the Fund (Pool VIII), Window Rock and Integrity included a table (Figure 2, below) that touted the success that Window Rock had with other seven asset pools in the Fund.

*Figure 2: Past Performance*

## CURRENT INDIVIDUAL POOL PERFORMANCE:

| Pool | Loan Types | Acquisition Date | Loan Count | Total Investment Amount | Leverage | Capital Returned to Date | % of Capital Returned | Multiple | Total Realized IRR | % of Assets Sold/Retained | Est. Portfolio Value | Projected Equity Return | Projected Multiple | Projected IRR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I | NPL* | Nov-10 | 67 | $1.1M | - | $770,636 | 70% | 0.99x | NM‡ | 89%/11% | $120,700 | $963,500 | 0.88x | NM‡ |
| II | NPL, SPL** | Feb-11 | 241 | $2.5M | - | $1,514,783 | 61% | 1.29x | 36% | 80%/20% | $1,001,400 | $2,948,400 | 1.18x | 12% |
| III | NPL, SPL | Jul-11 | 406 | $4.0M | - | $2,658,707 | 66% | 1.35x | 55% | 69%/31% | $2,210,000 | $5,555,500 | 1.39x | 33% |
| IV | SPL | Dec-11 | 313 | $5.3M | - | $5,197,768 | 98% | 1.63x | 94% | 59%/41% | $3,237,900 | $8,581,700 | 1.63x | 43% |
| V | NPL, RPL† | Oct-12 | 152 | $2.6M | - | $1,415,807 | 56% | 1.16x | 96% | 51%/49% | $1,607,400 | $3,208,300 | 1.26x | 23% |
| VI | RPL | Oct-12 | 325 | $7.0M | - | $227,382 | 5% | - | - | 0%/100% | $9,809,400 | $10,475,300 | 1.49x | 27% |
| VII | NPL, RPL | Dec-12 | 137 | $3.2M | - | - | - | - | - | 0%/100% | $5,180,500 | $5,254,300 | 1.63x | 31% |
| Total Portfolio | | | 1,641 | $25.7M | - | $11,890,082 | 46% | 1.37x | 54% | 38%/62% | $23,167,300 | $36,973,200 | 1.44x | 28% |

52.     The table (Figure 2) represented that all but one of the asset pools was performing positively with substantial rates of return of between 12% and 43%. Only Asset Pool I appeared, from the table, to provide no real return on the investment.

53.     In his April 2, 2020, conference call with investors, Patrick Cardon acknowledged that of the seven asset pools in the table that were used to promote the sale of interest in the new eighth asset pool. Three of the asset pools, in fact, lost money, three made modest positive returns and one broke even. The actual performance of the seven asset pools was materially worse than Window Rock and Integrity had represented in their promotion Presentation.

**D.     Information Provided to Investors, Including Plaintiffs**

54.     Investors received two pieces of information from Window Rock and Integrity: (i) Quarterly Updates from Window Rock sent to Integrity and then distributed to Plaintiffs who invested through Integrity, and (ii) annual Asset Reviews prepared by Integrity.

11

55.     The information provided to investors by Integrity through these documents painted a glowing picture of the Fund's performance. Window Rock and Integrity were telling investors throughout 2017-2019 that the fund was performing positively—that "Collateral Value" of the investments far exceeded the assets invested and provided a substantial "Margin of Safety" for the investor.

56.     Figure 3 is an excerpt from the last Quarterly Update that Plaintiffs received in the third quarter of 2019. It shows the Margin of Safety that Window Rock and Integrity were reporting to investors from 2018 through the third quarter 2019, including Plaintiffs.

*Figure 3: Window Rock/Integrity Reported Margin of Safety*



57.     Consistent with a positive Margin of Safety, each of the Quarterly Updates showed that the "Collateral Value/Investment Basis" was always positive. In the 2019 third quarter Quarterly Update, Window Rock and Integrity represented that Collateral Value was 145% of the Investment Basis. In other words, the value of the assets (*i.e.*, the

distressed real estate loans and properties) held exceeded the amounts invested to buy those assets by 45%.

### E. Information Which Window Rock and Integrity Had, but Concealed from Plaintiffs

58. At the same time Integrity and Window Rock were telling investors the Fund was financially sound and provided a substantial Margin of Safety, Defendants received financial reports (ALPS Custodian Statements, Audited Income Statements and Balance Sheets, collectively the "Financial Reports") indicating, almost from inception, that the Fund was in fact cratering. A comparison of these Financial Reports to the Quarterly Updates clearly shows that the representations that Window Rock and Integrity made to investors in the Quarterly Updates and Asset Reviews were false.

59. Table 1, below, compares what Plaintiffs were being told by Window Rock and Integrity in the Quarterly Updates and on the left are what the Financial Reports showed to Window Rock for the full Fund (in blue) and the portion of the Fund to which Integrity subscribed (in yellow).

*Table 1: Comparison of What Plaintiffs Were Told About the Financial Performance of the Fund and What Window Rock and Integrity Knew Based on Financial Statements*

| Period | Information Provided to Investors | | | | | | Information Provided to Sponsors of Window Rock Fund | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | By Window Rock Quarterly Updates | | | By Integrity Asset Review for Acct # 19800 | | | By ALPS | | | | | |
| | | | | | | | To Window Rock | | | To Integrity | | |
| | Fund Asset AUM | Collateral Val/Inv Basis | Margin of Safety | Cost | Market Value | Annual Yield | Consolidtor Asset Balance | YTD Net Income (Loss) | Since Inception Net Income (Loss) | Investor Ending Balance Qtr to Date | Gross Income (Loss) YTD | Gross Income(Loss) Since Inception |
| 1Q 2017 | | | | $500,000 | $500,000 | | | | | | | |
| 2Q 2017 | $26,900,000 | 152% | $13,800,000 | $455,975 | $455,975 | | $16,591,785 | ($2,331,930) | ($3,350,791) | $4,093,852 | ($453,811) | ($453,811) |
| 3Q 2017 | | | | $437,692 | $437,692 | | $14,883,698 | ($2,787,330) | ($3,806,191) | | | |
| 4Q 2017 | $25,000,000 | 148% | $12,100,000 | $434,334 | $434,334 | | $14,781,449 | ($2,818,354) | ($3,837,214) | $3,690,573 | ($504,570) | ($504,570) |
| 1Q 2018 | | | | $425,191 | $425,191 | | | | | | | |
| 2Q 2018 | $22,200,000 | 122% | $5,900,000 | $420,527 | $420,527 | | $12,901,324 | ($1,335,283) | ($5,059,393) | $3,209,917 | ($263,797) | ($740,662) |
| 3Q 2018 | $18,300,000 | 151% | $9,200,000 | $413,810 | $413,810 | | | | | | | |
| 4Q 2018 | $15,700,000 | 125% | $4,600,000 | $413,810 | $413,810 | | $10,797,599 | ($3,176,852) | ($6,900,962) | $2,670,620 | ($666,321) | ($1,143,184) |
| 1Q 2019 | | | | | | | | | | $2,300,744 | ($147,574) | ($1,494,462) |
| 2Q 2019 | $13,300,000 | 145% | $7,800,000 | $413,810 | $413,810 | 10% | | | | $2,136,817 | ($296,506) | ($1,643,394) |
| 3Q 2019 | $7,300,000 | 145% | $4,800,000 | $410,545 | $410,545 | 10% | | | | $1,794,901 | ($583,617) | ($1,930,505) |
| 4Q 2019 | | | | $349,784 | $349,784 | 10% | $2,433,372 | ($4,188,575) | ($11,921,115) | $598,336 | ($973,817) | ($2,320,705) |

60.     The Financial Reports showed the Fund losing money, almost from its inception, but Plaintiffs were consistently told by both Window Rock and Integrity that the Fund was performing positively and Plaintiffs' assets were safe.

**F.     Close of the Fund and April 2, 2020 Investor Video Conference**

61.     Window Rock closed the Fund on February 28, 2020.

62.     Plaintiffs lost all assets they invested that they had not taken out of the fund earlier. In sum, they lost over $1.3 million, which was approximately 66% of what they had invested.

63.      On March 3, 2020, Plaintiffs' financial advisor, Hines, received notice that the Fund had been closed which was communicated to him in a late quarterly investor letter.

64.     Hines demanded answers from Integrity, and he requested a teleconference with both Window Rock and Integrity to discuss the matter. Integrity set up a call with Window Rock via a Zoom video conference for April 2, 2020, to discuss the closing of the Fund and to understand what happened.

65.     In attendance with Hines were Patrick Cardon and Cordell Rogers of Window Rock and Eric Davis and Justin Dealy for Integrity.

66.     During the call, Cardon stated that of the eight pools of funds (the seven listed in Figure 2, above plus the Fund at issue) only three made modest profits, four lost money and one broke even.

67.     Eric Davis reported during the call that in a recent call with Jeff Pettiford, an Executive Officer and Sales Manager for Window Rock located in Chicago, Pettiford

advised him that the Fund's return was going to be positive and in the 6-9% range. Pettiford had made similar representations to Hines, and at no time did Pettiford or anyone at Window Rock or Integrity ever suggest there would be a loss.

68.     Cardon admitted in the call that Window Rocks' "written communications were not clearly communicating what was really going on in the fund."

69.     Cardon stated that the Quarterly Updates were sent to Integrity for distribution to investors along with the financial statements and that "If you looked at the financial statements it is not a pretty picture." Cardon further stated that "Jeff's [Pettiford's] role was to communicate this and it didn't get communicated."

70.     Integrity never sent the financial statements to Plaintiffs or their financial advisor during the life of the Fund. Accordingly, only Window Rock and Integrity understood the true financial state of the Fund, and that the Quarterly Updates were materially misleading.

**COUNT I: SECURITIES FRAUD**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Against All Defendants)**

71.     Plaintiffs repeat and reallege Paragraphs 1 through 70 as if fully set forth herein as Paragraph 71.

72.     Defendants made or approved materially false and misleading statements or omissions specified above, which they knew or deliberately disregarded were misleading and failed to disclose material facts necessary to make the statements made not misleading.

15

## Misrepresentations Relied on in Initially Investing in the Fund

73.     Window Rock through Integrity provided the Presentation to Plaintiffs'

financial advisor, Hines, (excerpts of which are referenced in Figures 1 and 2, above)

prior to any investment in the Fund.

74.     Hines used the Presentation in evaluating the investment and in

recommending it to Plaintiffs. Hines gave a copy of the Presentation to Plaintiffs.

75.     Both Plaintiffs and Hines relied on the Presentation in electing to invest

Plaintiffs' assets in the Fund.

76.     Specifically, Plaintiffs and Hines relied on the Presentation table (*see*

Figure 2, above) showing that Window Rock had been very successful in managing

seven other funds, similar to the Fund at issue. The table represented that six of the

seven other funds had significant positive returns in the range of 12% to 43%, and one

fund was breaking even.

77.     These representations were untrue according to Patrick Cardon's

disclosure in his April 2, 2020 Zoom video conference when he admitted that

communications were not what they should have been and that only three of the seven

funds made a modest profit.

78.     Plaintiffs do not have access to the actual performance on the seven funds

listed in Figure 2. Only Defendants have that information. However, on information

and belief, Plaintiffs allege that the table in Figure 2 grossly misrepresented the

performance of the seven funds. Based on Plaintiffs' experience with the eighth Fund,

the Fund at issue, Plaintiffs believe that the seven other funds were performing and ultimately performed much worse than Window Rock reported in the table.

79.     The misrepresentations and omissions were material. Plaintiffs considered them important in making their investment decisions, as would any similarly situated reasonable investor. Plaintiffs' financial advisor, Hines, would not have recommended Plaintiffs invest in the Fund, or even presented the proposal to his clients, if he had known at the outset that the other Funds Window Rock managed were not performing as Window Rock and Integrity represented.

80.     Defendants acted with an intent to deceive or with recklessness because they knew or consciously disregarded the false or misleading statements or omissions in the Presentation in relation to the Fund.

81.     Defendants' knowledge or reckless disregard for the falsity of the representations and omissions alleged herein, and the existence of the true facts, is evidenced by the facts that, at the time these representations were made Window Rock had to know the true facts as to the performance of the seven funds it was managing. Moreover, as "Sponsor" of the Fund, Integrity, too, must have known the performance of these seven funds if it was using such performance to promote the eighth Fund. By listing its name on the cover of the Presentation as "Sponsor" it was attesting to the accuracy of the statements and information in the Presentation.

### Misrepresentations Relied on During the Life of the Fund

82.     Window Rock distributed Quarterly Updates to Integrity along with financial statements on the state and performance of the Fund to date.

17

83.     Integrity distributed the Quarterly Updates to Plaintiffs directly, or to Hines who sent the Updates to Plaintiffs.

84.     The Quarterly Updates contained false and misleading information about the performance of the Fund. Specifically, the Quarterly Updates reflected that the Fund was performing positively, when in fact the Fund was rapidly losing money. *See* Table 1, *above*.

85.     Both Window Rock and Integrity, including the Individual Defendants, had Financial Reports showing that the Fund was losing money and that there was no "Margin of Safety" at the same time that they were reporting to Plaintiffs that the Fund had a significant "Margin of Safety" and that the "Collateral Value" of the assets held in the Fund ranged between 140% to 150% of the Plaintiffs' invested assets. (*See* Table 1, above.)

86.     The repeated misrepresentations in the Quarterly Updates were material in Plaintiffs' decision to invest additional assets in the Fund and to keep their assets in the Fund.

87.     Had Plaintiffs been aware of the true performance of the Fund, they, like any rational investor, either would have moved assets out of the Fund or taken other actions to protect their assets.

88.     Defendants acted with an intent to deceive or with recklessness because they knew or consciously disregarded the false or misleading statements or omissions

89.     Defendants' knowledge or reckless disregard for the falsity of the representations and omissions alleged herein, and the existence of the true facts, is

18

evidenced by their possession of the true facts as to the performance of the Fund in that they had the Financial Reports which clearly showed that the representations in the Quarterly Updates were false.

90.     Defendants' misrepresentations and omissions were made in connection with the purchase or sale of a security.

91.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their investment in the Fund in the amount of approximately $1.3 million.

WHEREFORE, Plaintiffs request that this Court award them damages in the amount in excess of $1.3 million, which is the amount Plaintiffs had invested in the Fund that was never returned to them, plus attorney fees pursuant to statute and costs, and such other relief as the Court deems just and proper.

## COUNT II: VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against the Individual Defendants - Patrick Cardon, Cordell Rogers, and Eric Davis)

92.     Plaintiffs repeat and reallege Paragraphs 1 through 70 as if fully set forth herein as Paragraph 92.

93.     The Individual Defendants acted as controlling persons within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of the Fund or Integrity, the Individual Defendants had the power and the authority to cause the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiffs request that this Court award them damages in an amount in excess of $1.3 million, which is the amount Plaintiffs had invested in the Fund that was never returned to them, plus attorney fees pursuant to statute and costs and such other relief as the Court deems just and proper.

## COUNT III: BREACH OF FIDUCIARY DUTY
### (Against Eric Davis and the Integrity Entities)

94. Plaintiffs repeat and reallege Paragraphs 1 through 70 as if fully set forth herein as Paragraph 94.

95. A fiduciary relationship existed between Plaintiffs and Integrity, including Eric Davis, because Plaintiffs reposed trust and confidence in Integrity and Eric Davis as the parties with whom Plaintiffs entrusted their funds and relied on for reporting of the performance of their investment in the Fund.

96. Specifically, Plaintiffs entrusted their assets with Integrity because Integrity represented that it fully researched the Fund and the Fund's management team and "Sponsored" the investment.

97. Moreover, as the subscriber to the Fund, Integrity was entrusted with receiving financial reporting from the Fund and did in fact receive detailed Financial Reports from Window Rock.

98. Integrity represented to Hines and to Plaintiffs generally that Integrity would annually review the state of the Fund and report on its performance compared to expectations set out in the Presentation and in the Quarterly Updates.

99.     Most importantly, Plaintiffs relied on Integrity and Eric Davis for information as to the financial state of the Fund.  Integrity withheld the detailed financial statements from Plaintiffs and Hines, and only provided the Quarterly Updates, which were false and misleading when compared to the financial statements.

100.     Defendants knowingly, recklessly and negligently breached the fiduciary duties owed to Plaintiffs by, among other things, failing to (i) properly evaluate the Fund prior to investment in the Fund, (ii) monitor the investments made on behalf of the Fund, (iii) accurately explain to Plaintiffs the financial state of the Fund, and (iv) concealing financial records from Plaintiffs that Integrity and Davis had and that clearly showed the Fund was failing, while providing Quarterly Updates that showed the Fund was thriving.

101.     Plaintiffs suffered damages proximately caused by Defendants' breach in excess of $1.3 million.

WHEREFORE, Plaintiffs request that this Court award them damages in an amount in excess of $1.3 million, which is the amount Plaintiffs had invested in the Fund that was never returned to them, plus attorney fees pursuant to statute and costs and such other relief as the Court deems just and proper.

### COUNT IV: COMMON LAW FRAUD UNDER ILLINOIS LAW
### (Against All Defendants)

102.     Plaintiffs repeat and reallege Paragraphs 1 through 91 as if fully set forth herein as Paragraph 102.

21

103.     Defendants made or approved materially false and misleading statements or omissions specified above, which they knew or deliberately disregarded were misleading and failed to disclose material facts necessary to make the statements made not misleading.

104.     Defendants solicited investments in the Fund through the Presentation and the Quarterly Updates.

105.     In addition, Defendants, through Jeff Pettiford (Window Rock) and Eric Davis (Integrity) provided periodic reviews of the Fund's performance to Plaintiffs and their financial advisor.

106.     Defendants intended for their representations as to the performance of other funds (*see* Figure 2), and the Fund at issue (*see* Table 1 and Figure 3) to cause Plaintiffs to invest and hold their assets in the Fund.

107.     The representations Defendant's made were materially false and misleading.

108.     Plaintiffs relied on those representations to the loss of 66% of their investment.

WHEREFORE, Plaintiffs request that this Court award them damages in an amount in excess of $1.3 million, which is the amount Plaintiffs had invested in the Fund that was never returned to them, plus attorney fees pursuant to statute and costs and such other relief as the Court deems just and proper.

## COUNT V: NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

109.     Plaintiffs repeat and reallege Paragraphs 1 through 91 as if fully set forth herein as Paragraph 109.

110.     Defendants made or approved materially false and misleading statements or omissions specified above, which they knew or deliberately disregarded were misleading and failed to disclose material facts necessary to make the statements made not misleading.

111.     Defendants were negligent in ascertaining the truth of the Presentation table (*see* Figure 2, above) in that they either intentionally or negligently showed that Window Rock had been very successful in managing seven other funds, when in fact those representations were untrue according to Patrick Cardon's disclosure in his April 2, 2020 Zoom video conference.

112.     Defendants were also negligent in ascertaining the truth of Quarterly Updates either. Those Updates showed very positive Fund performance, whereas the financial records available only to Window Rock and Integrity showed the Fund was failing.

113.     Defendants were in the business of supplying information to Plaintiffs and did supply information, in the form of the Quarterly Updates and the periodic Fund risk reviews that Integrity conducted.

114. Defendants made the statements and omissions for the purpose of inducing reliance by Plaintiffs in that Defendants used these false and misleading statements to cause Plaintiffs to invest and remain in the Fund.

115. Each of the above misrepresentations and omissions were material in that Plaintiffs considered them important and reasonably relied upon such statements and omissions to their detriment.

116. Had Plaintiffs been aware of the true poor performance of the seven other Funds Window Rock was managing, they, like any rational investor, would have never invested in the Fund. Additionally, had they been aware of the true performance of the Fund as reflected in the financial statements, to which only Window Rock and Integrity were privy, they would have moved assets out of the Fund or taken other actions to protect their assets.

117. As a consequence of Plaintiffs' reliance on the foregoing misrepresentations and omissions made by the Defendants, Plaintiffs have been injured.

WHEREFORE, Plaintiffs request that this Court award them damages in an amount in excess of $1.3 million, which is the amount Plaintiffs had invested in the Fund that was never returned to them, plus attorney fees pursuant to statute and costs and such other relief as the Court deems just and proper.

## COUNT VI: FOR VIOLATION OF THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT ("IUDTPA"), 815 Ill. Comp. Stat. Ann. 505/*et seq.* (Against All Defendants)

118. Plaintiffs repeat and reallege Paragraphs 1 through 91 as if fully set forth herein as Paragraph 118.

119.     Plaintiffs are consumers under the IUDTPA.

120.     Defendants engaged in a deceptive act or practice in that they promoted an investment in the Fund using false and misleading information relating to both the performance of other funds managed by Window Rock (*see* Figure 2) and reporting that the Fund at issue was performing well, when it was not in the Quarterly Updates. Moreover, Pettiford and Davis periodically reported on the state of the Fund and represented that the Fund was performing well and would have a positive return.

121.     Defendants intended for Plaintiffs to rely on their misrepresentations and omissions of material facts.

122.     The misrepresentations were made in the course of commerce.

123.     Plaintiffs relied on Defendants' misrepresentations in investing and keeping their assets in the Fund until the Fund failed.

124.     Plaintiffs suffered damages proximately caused by Defendants' misrepresentations in the amount of $1.3 million.

WHEREFORE, Plaintiffs request that this Court award them damages in an amount in excess of $1.3 million, which is the amount Plaintiffs had invested in the Fund that was never returned to them, plus attorney fees pursuant to statute and costs, and such other relief as the Court deems just and proper.

## <u>COUNT VI: FOR VIOLATION OF THE ILLINOIS SECURITIES LAW OF 1953</u>
## <u>815 Ill. Comp. Stat. 5/12</u>
## <u>(Against All Defendants)</u>

125.     Plaintiffs repeat and reallege Paragraphs 1 through 91 as if fully set forth herein as Paragraph 125.

126.     The allegations pled in Count I satisfy the pleading requirements for a claim alleging a violation under Section 12 of the Illinois Securities Law of 1953. 815 Ill. Comp. Stat. 5/12.

WHEREFORE, Plaintiffs request that this Court award them damages in an amount in excess of $1.3 million, which is the amount Plaintiffs had invested in the Fund that was never returned to them, plus attorney fees pursuant to statute and costs, and such other relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiffs demand trial by jury on all matters triable to a jury.


Dated: February 25, 2022                    Plaintiffs


                                            By */s/ Darrell J. Graham*
                                            Their Counsel

                                            Darrell J. Graham
                                            Ashley J. Stump
                                            ROESER TANNER & GRAHAM LLC
                                            2 North Riverside Plaza, Suite 1850
                                            Chicago, IL  60606
                                            312-621-0301
                                            dgraham@rtglaw.com

26